FILED

2015 May-19  PM 04:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **RHIANNA MOON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 4:13-CV-1992-VEH** |
| | ) | |
| **KAPPLER, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

## <u>MEMORANDUM OPINION AND ORDER</u>

This is a civil action filed by the plaintiff, Rhianna Moon, against the defendant, Kappler, Inc. ("Kappler"), alleging violations of the Family Medical Leave Act ("FMLA"), 28 U.S.C. § 2601, *et seq*., and the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq*. Specifically, the complaint alleges FMLA Interference (Count One), FMLA Retaliation (Count Two), and Discrimination in Violation of the ADA (Count Three). All counts arise out of the plaintiff's employment with the defendant.

The case comes before the court on the cross motions for summary judgment filed by the parties. (Docs. 26, 27). The defendant moves for summary judgment on all claims. (Doc. 26). The plaintiff seeks summary judgment on her FMLA Interference claim only. (Doc. 27). For the reasons stated herein, both motions will be

**DENIED.**

## I.      STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (internal quotation marks and citation omitted). The party requesting summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings in answering the movant. *Id.* at 324. By its own affidavits – or by the depositions, answers to interrogatories, and admissions on file – it must designate specific facts showing that there is a genuine issue for trial. *Id.*

The underlying substantive law identifies which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All

reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman*, 229 F.3d at 1023. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the evidence presented by the non-movant to rebut the moving party's evidence is merely colorable, or is not significantly probative, summary judgment may still be granted. *Id.* at 249.

How the movant may satisfy its initial evidentiary burden depends on whether that party bears the burden of proof on the given legal issues at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). If the movant bears the burden of proof on the given issue or issues at trial, then it can only meet its burden on summary judgment by presenting *affirmative* evidence showing the absence of a genuine issue of material fact – that is, facts that would entitle it to a directed verdict if not controverted at trial. *Id.* (citation omitted). Once the moving party makes such an affirmative showing, the burden shifts to the non-moving party to produce "significant, probative *evidence* demonstrating the existence of a triable issue of fact." *Id.* (citation omitted) (emphasis added).

For issues on which the movant does not bear the burden of proof at trial, it can

satisfy its initial burden on summary judgment in either of two ways. *Id.* at 1115-16. First, the movant may simply show that there is an absence of evidence to support the non-movant's case on the particular issue at hand. *Id.* at 1116. In such an instance, the non-movant must rebut by either (1) showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.* at 1116-17. When responding, the non-movant may no longer rest on mere allegations; instead, it must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358 (1996). The second method a movant in this position may use to discharge its burden is to provide affirmative *evidence* demonstrating that the non-moving party will be unable to prove its case at trial. *Fitzpatrick*, 2 F.3d at 1116. When this occurs, the non-movant must rebut by offering *evidence* sufficient to withstand a directed verdict at trial on the material fact sought to be negated. *Id.*

"The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed." *S. Pilot Ins. Co. v. CECS, Inc.*, No. 1:11-CV-3863-AT, 2014 WL 4977805, at *2 (N.D. Ga. Sept. 12, 2014) (*citing Am. Bankers Ins.*

*Group v. United States*, 408 F.3d 1328, 1331 (11th Cir.2005)). "The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration." *Id.* "The Eleventh Circuit has explained that '[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed.'" *Id.* (*quoting United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir.1984)). "Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts. *Id.* (*quoting Oakley*, 744 F2d at 1555–56).

## II.   FACTS

The defendant, Kappler, operates a manufacturing plant in Guntersville, Alabama, which manufactures protective apparel. It employs approximately 90 "production technicians" at the Guntersville plant. On April 7, 2008, Kappler hired the plaintiff as one of those production technicians. Her supervisor during the time period leading up to and including her termination was Chris Gilreath.

The plant manager during the plaintiff's employment was Donna Haynes. Haynes "is in charge of the workforce there at the facility." (Doc. 30-1 at 5(90)). She describes herself as the "top management person" for production technicians working

5

at the plant. (Doc. 30-1 at 5(10)).[1]

## A. **Kappler's Relevant Employment Policies**

### 1. *Progressive Disciplinary Policies*

At the commencement of her employment at Kappler, the plaintiff received a copy of Kappler's Employee Handbook which contained various company policies and procedures. (Doc. 30-3 at 76). One of those policies is Kappler's "progressive disciplinary policy," the steps of which, in order, normally[2] include: (1) a verbal warning, (2) a first written warning, (3) a second written warning, and (4) termination. (Doc. 30-3 at 6(19); doc. 30-3 at 98). Under the system, it is "grounds for immediate termination" to receive four disciplinary actions within a rolling twelve (12) month period. (Doc. 30-3 at 98). In her affidavit, Haynes states that "Kappler managers are authorized by policy to skip disciplinary steps." (Doc. 30-2 at 5, ¶ 9). Also according to Haynes, "[p]ursuant to Kappler's policy and practice, the disciplinary warnings do not have to be violations of the same policy, or even related," in order to combine for a termination. (Doc. 30-2 at 6, ¶9). The policy also notes that "certain violations are

---

[1] Citations to travel transcripts of depositions appear in this form: "(Doc. 30-1 at 5(10))" "Doc. 30-1" refers to the document number in the court file. The notation "at 5" refers to the court document page number on which the quoted material appears. The notation "(10)" refers to the specific page of the deposition on which the quoted material appears.

[2] See doc. 30-3 at 98 which calls these steps "[t]he normal steps in the company's disciplinary policy[.]"

6

considered serious and may warrant immediate termination." (Doc. 30-3 at 98).

Elsewhere, the handbook provides that

[c]ertain conduct, or disregard for the rules, are [sic] severe enough to result in disciplinary action or termination, some of which are [sic] as follows:

a.     Continual lateness or unauthorized absences.

b.     Bringing firearms or any other weapon on the premises.

c.     Being on company premises while under the influence of alcohol or drugs or possessing alcohol or drugs on company premises.

d.     Fighting, scuffling, horse playing or interfering with another employee's work.

e.     Profane or abusive language.

f.     Theft in any form.

g.     Insubordination or refusal to accept assignments.

h.     Dishonesty in any form, including falsification of job application form, time card or daily production record.

I.     Interfering with the work assignments of fellow workers.

j.     Abuse or destruction of company property or the property of fellow employees.

k.     Deliberately disregarding safety rules or repeated negligent disregard of safety rules.

l.     Disobeying employee rules and regulations.

m.     Any other form of conduct that interferes with the orderly

7

operation of the business.

n.     Trucking and traffic violations while on company business.

o.     Violations of work safety rules.

(Doc. 30-3 at 97-98). In her deposition, Haynes agreed that there was discretion in this area as well. As an example, she stated that while there would be no discretion for "stealing," "there would be some discretion as to whether [she] would [give] somebody discipline for," "profane or abusive language," "insubordination," or "interfering with work assignments of fellow workers." (Doc. 30-1 at 33(122-123)). The parties have not explained how this policy would, should, or does, work with the "progressive discipline policy."

### 2.   *Kappler's Cell Phone Usage Policy*

The Employee Handbook provides:

**TELEPHONES AND CELL PHONES**

Telephones are provided for your personal use. Telephone calls are to be made or received only during your non-working time such as lunch or breaks. The only exception to this rule is if an emergency call is received.

Employees are expected to exercise the same discretion in using personal cellular phones as is expected for the use of company phones. The company will not be liable for the loss of personal cellular phones brought into the workplace.

(Doc. 30-3 at 101) (capitalization and bold in original).

8

A May 11, 2011, reminder notice, signed by employees of Kappler, including the plaintiff, states "[c]ell phones . . . cannot be in your work surface area [and] . . . should be stored out of sight." (Doc. 30-3 at 104). In her deposition, the plaintiff acknowledged that she signed this document, and that she has always followed this policy. (Doc. 30-3 at 10(33)).

A March 7, 2012, reminder notice, signed by employees of Kappler, including the plaintiff, states "[u]se of cell phones are [sic] not allowed during your working hours, only at breaks." (Doc. 30-3 at 103). In her deposition, the plaintiff acknowledged having read and signed this reminder too, and stated that she understood that to be the rule at Kappler. (Doc. 30-3 at 9(29)). Even though she acknowledged in her deposition that she would have to use her cell phone to text, the plaintiff stated that she did not understand the policy to prohibit texting. (Doc. 30-3 at 9(30-32)).

On October 25, 2012, the day after the plaintiff was terminated, Haynes issued a notice to employees which stated:

> Cell phones or any electronic device that can be used to call, text[,] or access the internet should **not** be used on the sewing floor during working hours. These devices should be kept out of sight[;] **do not have them on any work area.**
>
> Any violation of this policy will result in disciplinary action.

(Doc. 30-1 at 108) (emphasis in original).

9

### 3.     *Attendance Policy*

Kappler's Employee Handbook contains an "Attendance Policy" which provides that employees who reach the following level of "unexcused" absences during a twelve month rolling period will be subject to warnings and terminations:

> **Verbal Warning** - greater than or equal to 44 hours
> **First Written Warning** – greater than or equal to 64 hours
> **Second Written Warning** – greater than or equal to 84 hours
> **Termination** – greater than or equal to 100 hours
>
> ·     Any misrepresentation by the employee concerning the reason for
> the absence will be grounds for immediate termination.

(Doc. 30-3 at 86) (emphasis in original).

The record includes an "attendance sheet" for the plaintiff which chronicles each of her tardies and absences, apparently for the entire time she was employed. (Doc. 30-1 at 80-89). It is in table format. The columns in the table explain, among other things, whether the particular incident was an occasion where the plaintiff was absent or tardy, the date of each absence or tardy, the number of hours during which the plaintiff was absent or tardy, a reason for the absence or tardy, and whether the absence or tardy was "excused." However, according to the defendant, absences which are denoted as "unexcused" in this document are <u>not</u> necessarily considered for discipline under the attendance policy. Instead, it depends on how the absence is "coded."

In her second affidavit, Haynes explained the coding system as follows:

Kappler's Absence Codes, used for all its employees, including Ms. Moon, are as follows:

**KAPPLER'S**
**ABSENCE CODES**                          **CORRESPONDING REASON**

| | |
|---|---|
| 4 | ABSENCE – Sickness, Personal, Family illness |
| 6 | PAID HOLIDAY |
| 7 | VACATION – Scheduled Paid Vacation |
| 8 | ABSENCE UNPAID – vacation & holidays off unpaid, LOA |
| 9 | VACATION – Paid, unscheduled, less than 10 days notice |
| 10 | ABSENCE PAID – Sick Pay |
| 32 | FAMILY MEDICAL LEAVE – PAID |
| 33 | FAMILY MEDICAL LEAVE – UNPAID |
| 34 | LEAVE EARLY– UNPAID HRS NOT WORKED DUE TO LACK OF WORK |

(Doc. 34-8 at 3). Haynes stated that "[t]he only code number which is 'counted against' an employee for absenteeism warning or excessive absentee purposes is an absence which is coded as a '4.'" (Doc. 34-8 at 3). She says that the other code numbers "only signify whether the leave was paid, unpaid, vacation, sickness, lack of work or FMLA. Although Kappler worked hard at classifying properly FMLA–qualified absences, as a practical matter, as long as the absence is not coded

11

as a '4[,]' . . . the only relevance to the employee is whether the employee is paid for that absence." (Doc. 34-8 at 3-4). In light of Haynes's explanation, it is unclear why there is a column denoting whether the absence is "excused." The parties do not explain how the absence policy works, if at all, in conjunction with the progressive discipline policy and/or the "[c]ertain conduct, or disregard for the rules" policy.

### 4.    *FMLA Leave Policy*

Kappler provides qualified employees with both paid and unpaid leaves of absence under the FMLA. Kappler also provides paid sick leave and paid vacation time to all employees. Any employee who has qualified for FMLA leave has the option to use paid sick leave and paid vacation time in place of taking unpaid FMLA leave. Additionally, employees who have reached three years of service with Kappler are entitled to four weeks of paid FMLA leave.

If an employee qualifies for FMLA leave and wants to take time off for that purpose, they must indicate that they wish to take the time off as FMLA leave or communicate reasons for the absence within the scope of the FMLA certification. The absence is then "coded" as FMLA leave on the employee's attendance record. Any absences that are coded as FMLA leave are considered "excused" absences and are not counted against the employee under the attendance policy. (Doc. 30-5 at 9).[3]

---

[3]This fact, offered by the defendant, is disputed by the plaintiff, but without citation.

B.   **Plaintiff's FMLA Certifications**

1.   ***Plaintiff's First FMLA Certification – March 29, 2011 through March 29, 2012***

The plaintiff submitted her first FMLA request on March 29, 2011. It was completed by Dr. Paul Muratta, a pain management specialist at Southeastern Pain Management Center, and notes:

– "Patient has low back pain due to central disc protrusions at L2/3, L3/4, L4/5, L5/11. This condition requires ongoing medical management and interventional procedures to control the pain and associated symptoms." (Doc. 30-3 at 122).

– The "probable duration of condition" is from March 29, 2011[,] through March 29, 2012. (Doc. 30-3 at 122).

– "[T]he employee [is not] unable to perform any of his/her job functions due to the condition[.]" (Doc. 30-3 at 122).

– The "beginning and end dates for the period of incapacity" would be "24 to 48 hours after interventional procedures for recovery." (Doc. 30-3 at 123).

– Office visits would be necessary every two months and that interventional procedures would be required every sixty to ninety days. (Doc. 30-3 at 123).

– The "part-time or reduced work schedule" was one or two days "post-procedure for recovery." (Doc. 30-3 at 123).

– The plaintiff could suffer flare-ups approximately once every "2-3" months

13

but "[it is] not medically necessary for the employee to be absent from work during the flare-ups[.]" (Doc. 30-3 at 123).

The form also indicates that the plaintiff's previous treatment for this condition occurred on January 26, February 10, February 24, and March 29, 2011. It states that the plaintiff's future appointments would be on "4/26/11, 5/25/11- office visit." (Doc. 30-3 at 123).

### 2. *Plaintiff's Second FMLA Certification – July 6, 2012*

On July 6, 2012, Plaintiff submitted a second FMLA Certification request, signed by Dr. Norman McCoomer, also a pain management doctor. Dr. McCoomer's FMLA Certification was similar in most aspects to the first certification completed by Dr. Muratta, including the "no" box checked in response to whether Moon's medical condition required her to be absent during flare-ups. The certification also indicates:

– It was in effect for an "undetermined" amount of time. (Doc. 29-4 at 3).

– The plaintiff had had previous office visits for this condition on March 8, April 20, June 1, and July 6, 2012. (Doc. 29-4 at 3).

– The plaintiff was "to be seen every 4-6 weeks by Physician and/or Nurse Practitioner regarding her chronic pain . . . is also required to attend weekly chronic pain education classes." (Doc. 29-4 at 3).

– Her physician was "unable to determine" the "frequency of flare-ups and the

duration of related incapacity that the patient may have over the next 6 months." (Doc. 29-4 at 4).

## C.   The Plaintiff's Absences

The parties agree that the following chart, provided by defendant,[4] accurately sets out the 25 separate dates on which the plaintiff claims she was entitled to FMLA leave:

_____

[4] Unlike the previously discussed "attendance record," this chart is not a business record of the defendant. It is merely a summary, prepared by the defendant.

| Plaintiff's Undisputed Facts Paragraph Number | Date of Absence | Doctor | Type of Appointment | Doctor's Excuse Bates # | Code/Reason | Attendance Record Bates Number |
|---|---|---|---|---|---|---|
| 9 | 1/26/11 | Southeastern Pain Management | "Office/Outpatient Visit, New" | 1313 | 4 – ABSENCE=Sickness, Personal, Family Illness | 1917 |
| 9 | 2/10/11 | Southeastern Pain Management | Various Injections | 1313 | 10 – ABSENCE PAID- Sick Pay | 1917 |
| 9 | 2/24/11 | Southeastern Pain Management | Various Injections | 1313 | 9 – VACATION-Paid, unscheduled, less than 10 days. notice | 1917 |
| | | | Start of First FMLA Leave – March 29, 2011 | | | |
| 9 | 3/29/11 | Southeastern Pain Management | "Office/Outpatient Visit, Est" | 1313 | 10 – ABSENCE PAID- Sick Pay | 1917 |
| 14 | 4/26/11 | Southeastern Pain Management | Various Injections | 1313 – 1314 | 32 – FAMILY MEDICAL LEAVE PAID | 1918 |
| 14 | 5/4/11 | Southeastern Pain Management | Various Injections | 1314 | 34 – LEAVE EARLY- UNPAID HRS NOT WORKED DUE TO LACK OF WORK | 1918 |
| 14 | 5/25/11 | Southeastern Pain Management | "Office/Outpatient Visit, Est" / Drug Screen | 1314 – 1315 | 32 – FAMILY MEDICAL LEAVE PAID | 1918 |
| 14 | 6/27/11 | Southeastern Pain Management | Various Injections | 1317 | 32 – FAMILY MEDICAL LEAVE PAID | 1918 |
| 14 | 7/28/11 | Southeastern Pain Management | "Office/Outpatient Visit, Est" | 1317 | 33 – FAMILY MEDICAL LEAVE UNPAID | 1918 |
| 14 | 10/13/11 | Southeastern Pain Management | "Office/Outpatient Visit, Est" | 1318 | 32 – FAMILY MEDICAL LEAVE PAID | 1919 |
| 14 | 10/27/11 | Southeastern Pain | Various Injections | 1318 | 32 – FAMILY MEDICAL | 1919 |

16

| | | | | | | |
|---|---|---|---|---|---|---|
| | | Management | | | LEAVE PAID | |
| 14 | 12/14/11 | Southeastern Pain Management | "Office/Outpatient Visit, Est" / Drug Screen | 1319 | 4 –ABSENCE Sickness, Personal, Family Illness | 1919 |
| 17 | 3/8/12 | McCoomer | "Office or Other Outpatient Visit for the Evaluation and Management…", Electrocardiogram, Drug Screen | 1717 | 10 – ABSENCE PAID- Sick Pay | 1920 |
| **End of First FMLA Leave – March 29, 2012** | | | | | | |
| 17 | 4/20/121 | McCoomer | "Lumbar Spine Medial Branch Block" | 1656 – 1657 | 10 – ABSENCE PAID- Sick Pay | 1920 |
| 17 | 6/1/12 | McCoomer | "No procedure was performed today due to other medical conditions that lead to the decision to postpone the procedure." | 1668 – 1671 | 10 – ABSENCE PAID- Sick Pay | 1920 |
| **Beginning of Second FMLA Leave – July 6, 2012** | | | | | | |
| 17, 20 | 7/6/12 | McCoomer | "Lumbosacral and Sacroiliac Joint Injections" | 1639 – 1641; 1675 – 1676 | 7 – VACATION- Scheduled paid vacation | 1921 |
| 25 | 7/11/12 | McCoomer | Group Psychotherapy | 1711 | Not listed | 1921 |
| 25 | 7/30/12 | McCoomer | Individual Psychotherapy | 1717 | 32 – FAMILY MEDICAL LEAVE PAID | 1921 |
| 21 | 8/3/12 | McCoomer | "Trigger Point Injections – Splenius Capitis, Trapezius and Rhomboid Musculature" | 1679-1683 | 32 – FAMILY MEDICAL LEAVE PAID | 1921 |
| 25 | 8/8/12 (Plaintiff probably meant 8/9/12) | McCoomer | Group Psychotherapy | 1710 | Not listed | 1921 |

| 22 | 8/31/12 | McCoomer | "No procedure was performed due to the patient's general unwillingness to undergo the procedure" | 1684 – 1687 | Not listed | 1921 |
| 25 | 9/28/12 | McCoomer | Group Psychotherapy | 1710 | Not listed | 1921 |
| 25 | 10/5/12 | McCoomer | Group Psychotherapy | 1709 | Not listed | 1921 |
| 23 | 10/17/12 | McCoomer | "Lumbar Epidural Steroid Injection – Interlaminar" | 1690 – 1693 | 32 – FAMILY MEDICAL LEAVE PAID | 1921 |
| 24 | 10/24/12 | McCoomer | Physical Therapy Evaluation | 1696 – 1697 | N/A – terminated this day | 1921 |

Of the plaintiff's absences noted above, only those on January 26, 2011 (a code "4") and December 14, 2011 (a code "4"), were counted against her for disciplinary purposes. In the plaintiff's attendance record, both were noted to be "unexcused." (Doc. 30-1 at 85).

Also, her absence on February 10, 2011, and her tardy on February 24, 2011, were also noted in her attendance report as "unexcused." (Doc. 30-1 at 85). The plaintiff's medical records reflect that she was seen at Southern Pain Management on January 26, and February 3, 10, and 24, of 2011. (Doc. 29-3 at 2). Defendant also marked Plaintiff's absences for March 8, April 20, and June 1, 2012, as unexcused in her attendance report. (Doc. 30-1 at 88). Again, the significance of these absences being "unexcused" is unclear.

18

During the one year period of her first certification, Dr. Muratta's records reflect that the plaintiff was given four (4) "procedural interventions" related to her back issues on April 26, 2011, May 4-5, 2011, June 27-28, 2011, and October 27-28, 2011.[5] For each of these interventional procedures and related inability to work, the plaintiff was given FMLA leave or (on May 4, 2011) an excused absence. None of these absences were counted against her for disciplinary purposes or any other purpose.

**D.    The Plaintiff Was Cited for Four Disciplinary Violations within the Twelve Months Preceding her Termination**

On January 26, 2012, the plaintiff received a verbal warning for continual tardiness and unauthorized absences for the period of January 26, 2011, through January 26, 2012. (Doc. 30-3 at 118).[6] The January 26, 2012, Employee Disciplinary

---

[5] Southeastern Pain Management Center produced a billing statement showing "OFFICE/OUTPATIENT VISIT" on January 26, March 29, May 25, July 28, October 13, and December 14, 2011; and it also indicates additional treatments on February 10, February 24, April 26, May 4, June 27, October 27, 2011, stating that the plaintiff received some form of "injection" or "epidural."

[6] Her attendance record reflects 87.52 hours of "unexcused" absences during all of 2011. (Doc. 30-1 at 87).  The plaintiff did not complain or take issue with her January 26, 2012 verbal warning, and even signed it acknowledging that she read the report (or warning). The plaintiff never challenged the validity of this warning during the entire period of her employment. She did not complain about the validity of the verbal warning in her EEOC charge which she filed on December 17, 2012. She did not complain about the validity of the verbal warning when she filed her complaint in this lawsuit on October 30, 2013. She did not complain about the validity of the verbal warning when she responded to Kappler's First Interrogatories on March 13, 2014. Only in response to Kappler's Second Interrogatories of August 12, 2014 did she, for the first time, contest this verbal warning.

Report (doc 30-3 at 118) does not contain a document entitled "Kappler Employee Absentee Detail" which is a document given to other employees when they receive such warnings. (Doc. 30-1 at 143-144). The plaintiff then received a first written warning for attendance violations on June 11, 2012. (Doc. 30-3 at 119). On June 26, 2012, the plaintiff received a second written warning for poor quality and low productivity. (Doc. 30-3 at 120).

A "Personnel Action Form" dated October 24, 2012, appears in the record. (Doc. 30-2 at 129). The form states that the plaintiff was involuntarily terminated that date for: "Failure to follow work rules & policies. Her supervisor caught her on facebook @ 11:15 and . . . made her aware of the issue. 30 minutes later [her supervisor] caught her doing the same thing." (Doc. 30-3 at 129). In her deposition, in reference to this incident, the plaintiff stated that she was texting (not using facebook) that day, during work hours, at her work station, during work time. (Doc. 30-3 at 22(82)-23(85)). The plaintiff admits that her supervisor approached her and told her "to stop texting," but says that only after that incident did she know that texting was not allowed. (Doc. 30-2 at 23(87)). The plaintiff states that, after that first instance, she did not text again. (Doc. 30-3 at 23(88)-24(89)).

It is undisputed that defendant's employees are not terminated for a violation of the cell phone policy by itself. Haynes stated that the plaintiff's alleged cell phone

use prior to October 24, 2012, had no bearing on the termination decision. Employees do not violate the defendant's rules by listening to music on portable listening devices such as an M-P3 player.

### E.   Alleged Comparators

#### 1.   *Josh Clark*

In her deposition, when asked whether Clark has a "disability," Haynes stated "Not that I know of." (Doc. 30-1 at 61(236)). Clark's attendance sheet reflects no absences or tardies coded with "32" or "33" for FMLA leave. (Doc. 36-3 at 2-3).

An Employee Disciplinary Report dated April 9, 2014, for Josh Clark, appears in the record. (Doc. 30-1 at 167). The report indicates that it is documenting a "Verbal Warning," for "Abuse or Destruction of Company Property." (Doc. 30-1 at 167). The "remarks" state: "Josh carved a girl[']s name into the arm on a hot air machine. This is destruction of company property. Machine is valued at $35,000." (Doc. 30-1 at 167). The report is signed by his supervisor, Jo Ann Sims. (Doc. 30-1 at 167). Haynes signed this report as a "witness." (Doc. 30-1 at 167). In her deposition, Haynes agreed that this warning was for "basically, damaging property." (Doc. 30-1 at 61).

An "incident" concerning Clark apparently occurred on April 15, 2014, which is documented in the record, but for which, apparently, no official discipline was given. (Doc. 36-1 at 3). Jessica Bishop, a supervisor, wrote in a memo:

Tuesday afternoon Connie Edwards asked Josh to turn a suit. He was setting [sic] down not doing anything. He got up looked around started to grab a suit that had just been put in the floor. He said that he couldn't come up there he had to turn this suit. I Jessica Bishop told him that Connie had asked him first and he needed to come turn her suit.

He came into module 35 and grabbed the suit. Connie told him that she was sorry for calling for him but the other guys were busy turning suits and he was just setting [sic] there. Then he said, "I will turn the damn suit." Connie Edwards and Joy Campbell were in the module with me (Jessica) and heard him say it.

(Doc. 36-1 at 3). When asked about this incident in her deposition, the following exchange occurred:

Q. So he didn't follow instructions, right?

A. I don't – I'm not sure if it was follow instructions or the language that he used.

Q. Well, profanity, as we looked at earlier, is against the rules, isn't it?

A. Yes.

Q. Is it subject to discipline?

A. Yes.

Q. And if he did not turn the suit as he was told to . . . that would also be a violation of the failure to following instructions?

. . .

A. Yes, it was an incident that a supervisor observed and documented.

. . .

22

Q. . . . So this is not formal discipline?

A. No.

Q. But it could have been?

A. Yes.

(Doc. 30-1 at 61(233-234)).[7]

An Employee Disciplinary Report dated April 22, 2014, for Josh Clark, appears in the record. (Doc. 36-1 at 4). The report indicates that it is a "First Written Warning," for "Insubordination" and "Poor Quality." (Doc. 36-1 at 4). The "remarks" state: "Refusing to follow direct work instructions from his supervisor." (Doc. 36-1 at 4). The report is signed by his supervisor, Jo Ann Sims. (Doc. 36-1 at 4). Haynes signed this report as a "witness." (Doc. 36-1 at 4). In her deposition, when asked if this was his "third incident but . . . second discipline," Haynes stated: "Second discipline, yes." (Doc. 30-1 at 61(235)).

Another Employee Discipline Report for Josh Clark, also dated April 22, 2014, appears in the record. (Doc. 36-1 at 5). The report indicates that it is a "Second Written Warning," for "Other: tobacco use." (Doc. 36-1 at 6). The "remarks" state: "Josh has been verbally warned about using tobacco on the sewing floor on 2 previous

---

[7] In its brief, the defendant writes: "While [p]laintiff seeks to characterize an "issue" with Josh Clark on April 15 and April 22, 2014[,] as discipline worthy, a review of the Clark documents makes clear why Ms. Bishop did not consider this issue worthy of a disciplinary warning." (Doc. 39 at 12). This statement fails to provide the court with any useful information.

occasions by D. Haynes and David Wise. He has been caught spitting his tobacco into a garbage can on the sewing floor." (Doc. 36-1 at 6). The report is signed by his supervisor, Jo Ann Sims. (Doc. 36-1 at 6). Haynes signed this report as a "witness." (Doc. 36-1 at 6). In her deposition, Haynes agreed that he had gotten "two separate write-ups for two separate infractions both dated the same day." (Doc. 30-1 at 61(235)). She also agreed that Clark would have had four official "disciplines" "if he had been written up for that incident dated April 15th." (Doc. 30-1 at 61(235-236)).

A "Personnel Action Form" dated May 23, 2014, shows that Clark was terminated that day for "Refusing to follow work instructions, insubordination to supervisor Chris Gilreath." (Doc. 30-1 at 169). The document is signed by Clark's supervisor, Jo Ann Sims, and by Donna Haynes as "Supervisor/Manager." (Doc. 30-1 at 169).

### 2. *Darlene Stanford*

At the time of her deposition, Haynes was not aware of whether Stanford had any "disability." (Doc. 30-1 at 58(223)). None of Stanford's absences or tardies were coded "32" or "33" for FMLA leave. (Doc. 36-4 at 2-3).

An Employee Disciplinary Report dated June 20, 2011, for Darlene Stanford, appears in the record. (Doc. 30-1 at 122). The report indicates that it documents a "Verbal Warning," for "Other." (Doc. 30-1 at 122). The "remarks" state: "Low

production 75.86%." (Doc. 30-1 at 122). The report is signed by her supervisor, Chris Gilreath. (Doc. 30-1 at 122). Haynes signed this report as a "witness." (Doc. 30-1 at 122). Stanford received a "First Written Warning" for low productivity on September 14, 2011. (Doc. 30-1 at 123). On September 15, 2011, Stanford received a "Second Written Warning" and a suspension for: "Abuse or Destruction of Company Property," "Insubordination," and "Poor Quality." (Doc. 30-1 at 124). The "remarks" section of the report explains: "Darlene is being suspended for 1 week without pay after multiple warnings she continues to produce poor quality work. She has failed to follow direct work instructions. Quality audit rejected for 5th time." (Doc. 30-1 at 124). Written on the form is: "Return back to work 9-22-11, DH." (Doc. 30-1 at 124). The document is signed by her supervisor, Chris Gilreath. (Doc. 30-1 at 124). Haynes signed the document as a witness. (Doc. 30-1 at 124). In her deposition, Haynes recognized that this could have been multiple offenses, but that "they all tied together," so discretion was exercised to issue just one. (Doc. 30-1 at 57(217)).

A Personnel Action Form dated September 29, 2011, shows that Stanford was terminated on that date for "[p]oor quality, low productivity." (Doc. 30-1 at 125). Tamy Uline is listed as Stanford's supervisor on this form, but Uline has not signed the form. (Doc. 30-1 at 125). Haynes is listed as Stanford's "Supervisor/Manager," but Haynes did not sign this form either. (Doc. 30-1 at 125). A memo in the record states:

Darlene Stanford was scheduled to return to work on Thursday 09/22/11 from her first suspension. She did not return. She called and left a voice mail on Tamy Uline[']s phone, stating that she did not remember when she was suppose[d] to return to work. She wanted Tamy to call her and tell her when she should return. Tamy was not at work that day.

She returned to work on Friday 09/23/11. Chris Gilreath and I talked with Darlene. I asked her why she did not report to work on Thursday; Darlene said she did not know that she was suppose[d] to. I asked her if she did not remember me telling her Thursday in the last meeting. I reminded her that the return date was also documented on the warning form that she signed that day. She said she did not remember it. I suspended Darlene again for not reporting back to work on Thursday 09/22/11as she should have. I repeated the date multiple times and make [sic] sure that she [k]new to return to work on Wed. 09/28/11.

She returned to work on Wed. 09/28/11. On Thursday 09/29/11 2 [cases] [were] rejected by quality. Darlene went th[rough] these 2 cases and sent them back to quality. Quality rejected these cases again. Chris Gilreath and I went thr[ough] them and found 6 suits that had quality problems. I terminated Darlene for poor quality and poor job performance.

(Doc. 30-1 at 126). In her deposition, Haynes admitted that she could have terminated Stanford for initially failing to return to work on the right day. (Doc. 30-1 at 57(217-218)). Instead, she was suspended twice before ultimately being terminated after yet another offense.

### 3.   *Brenna Cochran*

Haynes testified at her deposition that she was not aware whether Cochran had a disability. (Doc. 30-1 at 58(223)). None of Cochran's attendance sheets reflect absences or tardies which were coded as "32" or "33" for FMLA leave. (Doc. 30-1 at

120-121).

An Employee Disciplinary Report dated June 26, 2012, for Brenda Cochran, appears in the record. (Doc. 30-1 at 112). The report indicates that it is documenting a "Verbal Warning," for "Poor quality and low productivity." (Doc. 30-1 at 112). The report is signed by her supervisor, Chris Gilreath. (Doc. 30-1 at 112). Haynes signed this report as a "witness." (Doc. 30-1 at 112).  An Employee Disciplinary Report dated October 29, 2012, documents a "First Written Warning" for "55 hours of unexcused absences." (Doc. 30-1 at 113). The warning also states that "Breanna has a verbal for poor quality." (Doc. 30-1 at 113). The report is signed by her supervisor, Chris Gilreath. (Doc. 30-1 at 113). Haynes signed this report as a "witness." (Doc. 30-1 at 113).  In her deposition, Haynes stated that this disciplinary report made the plaintiff "aware of two issues on that one date." (Doc. 30-1 at 53(204)). Haynes admitted that discretion was exercised to give her only one write-up instead of two. (Doc. 30-1 at 54(205)).[8]

An Employee Disciplinary Report dated November 9, 2012, for Cochran, appears in the record. (Doc. 30-1 at 114). The report documents a "Second Written

_____

[8] The "remarks" section actually reads as if it was merely noting a previous verbal warning for poor quality. It states "Breanna has a verbal for poor quality." (Doc. 30-1 at 113). (emphasis added). However, since the defendant admits, through Haynes, that this could have been two warnings, and that version casts the facts in the light most favorable to the plaintiff, the court must accept that version of the facts in analyzing the defendant's motion for summary judgment.

Warning" for "Continual Tardiness" and "Unauthorized Absences." (Doc. 30-1 at 114). The report notes that Cochran had "accumulated 91.66 unexcused absence hours." (Doc. 30-1 at 114). The report is signed by her supervisor, Chris Gilreath. (Doc. 30-1 at 114). Haynes signed this report as a "witness." (Doc. 30-1 at 114).

A February 3, 2012, Personnel Action Report shows that Cochran was terminated that date for "poor attendance." (Doc. 30-1 at 118). It is signed by Donna Haynes as Cochran's "Supervisor/Manager." (Doc. 30-1 at 118). Chris Gilreath is listed as Cochran's supervisor–but she did not sign the form. (Doc. 30-1 at 118).

### 4. *Katie Golden*

Haynes testified at her deposition that she was not aware whether Golden had a disability. (Doc. 30-1 at58(223)). Golden's attendance sheet reflects no absences or tardies were coded "32" or "33" for FMLA leave. (Doc. 30-1 at 136-137).

Golden received a "Verbal Warning" for attendance on March 4, 2013 ("51 hours unexcused") (doc. 30-1 at 127), a first written warning for attendance on March 7, 2013 ("69 unexcused hours absenteeism") (doc. 30-1 at 128), and a "Second Written Warning" for attendance on May 2, 2013 ("84 [hours] of unexcused absences") (doc. 30-1 at 129). Golden's attendance report shows that she thereafter missed work days on May 21, 22, and 23, 2013, which were coded as "ABSENCE UNPAID--vacation & holidays off unpaid, LOA." (Doc. 30-1 at 131). These counted

as "excused" absences. If they had not been, the plaintiff could have been terminated for more than 100 unexcused hours in a 12 month period. Haynes terminated Golden on May 24, 2013, for "[r]efusing to follow work instructions." (Doc. 30-1 at 133).

### 5.   *Pam Gibbs*

Haynes stated in her deposition that she was not aware whether Gibbs had any sort of disability. (Doc. 30-1 at 58(224)). Gibbs's attendance sheet reflects no absences or tardies which were ever coded "32" or "33"for FMLA leave. (Doc. 36-5 at 2-4).

On May 19, 2011, Gibbs received a verbal warning from Becky King for "eating on floor." (Doc. 30-1 at 138). However, no Employee Discipline Report appears in the file regarding this incident. The record contains an employee discipline report for Ms. Gibbs dated August 22, 2011. (Doc. 30-1 at 102). It indicates that it is a "Second Written Warning," and the "remarks" section explains that "Pam continues to use her cell phone on the sewing floor after repeated warnings from her supervisor." (Doc. 30-1 at 102). The document is signed by Gilreath as her "supervisor," and Haynes as a "witness." (Doc. 30-1 at 139). In her deposition, Haynes agreed that, based on the use of the phrase "continues to use," Gibbs would not have received any discipline the first time she was seen using her cell phone. (Doc. 30-1 at 38(142-143)). There is no Employee Discipline Report in the record which documents a "First

Written Warning" of any kind concerning Gibbs.

A Personnel Action Report in the record reflects that Gibbs was terminated on January 18, 2012 for "[l]ow productivity and poor quality." (Doc. 30-1 at 141). This document is signed by Gilreath, who is listed as Gibb's "Supervisor," and by Haynes, as "Supervisor/Manager." (Doc. 30-1 at 141).

### 6.   *Vickie Rozanski*

Haynes testified in her deposition that she was unaware whether Rozanski has a disability. (Doc. 30-1 at 62(237)). None of her attendance sheets reflect a code "32" or "33" for any absence or tardy that was for FMLA leave. (Doc. 30-1 at 195-197).

Rozanski received a verbal warning on June 5, 2013, for "Continual Tardiness" and "Unauthorized Absences." (Doc. 30-1 at 191). The "remarks" section of the Employee Discipline Report issued on that day states: "Vickie has 50.46 unexcused absent hours. Per the policy a verbal warning is due." (Doc. 30-1 at 191). It is signed by Jessica Bishop as her "Supervisor." (Doc. 30-1 at 191). She received a "First Written Warning" on June 25, 2013, for "Continual Tardiness" and "Unauthorized Absences." (Doc. 30-1 at 193). The remarks section of the Employee Discipline Report issued that date states: "Vicki[e] has 68.48 unexcused hours . . . . Per policy this is a 1st written warning." (Doc. 30-1 at 193).   It is signed by Bishop as her "Supervisor," and Haynes as a witness. (Doc. 30-1 at 193).

Rozanski received a "Second Written Warning" on August 6, 2013, for "Continual Tardiness," and "Unauthorized Absences" after having "87.82 unexcused hours" of absences. (Doc. 30-1 at 194). The Employee Discipline Report documenting the warning was signed by Bishop as "Supervisor," and Haynes as "Witness." (Doc. 30-1 at 194). Thereafter, Rozanski had unexcused absences on August 8, 12, 13, 14, 15, and 16. (Doc. 30 at 197). The file does not indicate whether she has received any future warnings.

### 7. *Avery Thackerson*

The record contains an Employee Disciplinary Report for Avery Thackerson dated October 4, 2013. (Doc. 30-1 at 103). It indicates that it is a verbal warning for "[c]ontinued use of personal cell phone on blowing floor during work hours." (Doc. 30-1 at 103). It is signed only by Haynes as Thackerson's "supervisor." (Doc. 30-1 at 103). Haynes agreed in her deposition that the use of the phrase "continued use," meant that Thackerson was not disciplined the first time that she was seen using her phone. (Doc. 30-1 at 38(144)-39(145)).

### F. **Additional Facts**

Defendant's Human Resources Manager, Becky King, "spoke with Donna Haynes about the [FMLA] paperwork being received and that it was approved ... ." (Doc. 30-4 at 10(36)-11(37)). Haynes had knowledge of the plaintiff's FMLA leaves.

Haynes is responsible for coding the employee's attendance. The plaintiff's attendance sheet shows she was coded for FMLA absences on August 3, 2012 and October 17, 2012. (Doc. 30-1 at 89). Haynes stated either she or the plaintiff's supervisor would have coded the attendance sheet for October 17, 2012. Haynes remembers that the plaintiff had "an emergency room visit." Gilreath had general knowledge of the plaintiff's FMLA usage. Gilreath has knowledge of Defendant's code for FMLA usage under its attendance system. Gilreath denies having knowledge that the plaintiff had a medical appointment the day she was terminated. Gilreath later testified that she does not remember if the plaintiff told her that she had a physical therapist appointment the day she was fired. Gilreath stated that if the plaintiff was going to a healthcare professional, the plaintiff would tell her where she was going and why.

Defendant's Human Resources Manager is Rebecca ("Becky") King. Defendant's Human Resources Manager decides if FMLA leave is approved. Defendant's 30(b)(6) representative confirmed that the plaintiff's "July 6" leave was approved. King testified that she "spoke with Donna Haynes about [the plaintiff's] paperwork being received and that it was approved . . .." (Doc. 29-13 at 8(27)).

Aside from the Personnel Action Form describing the plaintiff's termination, Haynes kept no notes or documents regarding the plaintiff's termination meeting.

Defendant's response submitted to the Equal Employment Opportunity

32

Commission stated "Ms. Moon's employment with Kappler was terminated after she repeatedly and intentionally violated Kappler's prohibition against the use of cell phone while working. It was also her fourth disciplinary warning within 12 months, thus further warranting her termination." (Doc. 36-2 at 2).

Haynes testified that Defendant's company policies are meant to be applied consistently throughout the workforce.

The defendant does not dispute that it was on notice of the plaintiff's need for intermittent FMLA leave. Defendant's 30(b)(6) representative confirmed Defendant was on notice that the plaintiff's "July 6" leave did not have a set ending time.

During the 12-month period prior to June 2012, Defendant employed the plaintiff for at least 1,250 hours of service. Defendant employs fifty (50) or more persons for each working day during each of the 20 or more calendar workweeks in the current or preceding calendar year of the plaintiff's June 2012 leave. During the week of October 24, 2012, Defendant employed fifty or more employees, worked within 75 miles of the location where the plaintiff worked. Defendant is an entity subject to suit under 28 U.S.C. § 1331 and 29 U.S.C. § 2617(a)(2). Defendant employed at least fifty (50) persons for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year. Defendant employed these fifty (50) employees within 75 miles of the plaintiff's worksite.

III.   **ANALYSIS**

A.   **FMLA Interference (Count One) and Retaliation (Count Two)**

"The FMLA grants an eligible employee the right to take up to 12 workweeks of unpaid leave annually for any one or more of several reasons, including '[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1293 (11th Cir. 2006) (*quoting* 29 U.S.C. § 2612(a)(1)(D)). The Act creates a private right of action to seek equitable relief and money damages against employers who "interfere with, restrain, or deny the exercise of or the attempt to exercise" FMLA rights. 29 U.S.C. §§ 2615(a)(1), 2617(a).

The Eleventh Circuit has recognized that § 2615(a) creates two types of claims: "'interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act.'" *Hurlbert*, 439 F.3d at 1293 (quoting *Strickland v. Water Works and Sewer Bd. of the City of Birmingham,* 239 F.3d 1199, 1206 (11th Cir.2001)). In this case, the plaintiff claims both an FMLA interference and an FMLA retaliation claim.

### 1.    *The FMLA Interference Claim*

As noted previously, both parties move for summary judgment on this claim. "To establish an interference claim, 'an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied.' . . . The employee need not allege that his employer intended to deny the benefit—'the employer's motives are irrelevant.'" *Hurlbert*, 439 F.3d at 1293 (*quoting Strickland* 239 F.3d at 1207, 1208)); *see also, Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236, 1241 (11th Cir. 2010) ("To succeed under [an] interference theory, [the plaintiff] must demonstrate only that she was denied a benefit to which she was entitled under the FMLA.") (internal quotations omitted).

The plaintiff claims that she had a right to take FMLA leave on October 24, 2012, to attend a medical appointment, and return to work the next day. She argues only that the defendant interfered with her right to take her leave, that day, by firing her on October 24, 2012. (Doc. 28 at 19-20; see also doc. 28 at 25 ("Defendant cannot dispute [p]laintiff was to commence FMLA leave on October 24, 2012, but prior to commencing such leave [d]efendant terminated [p]laintiff's employment," and doc. 37 at 11 ("Plaintiff had the right to commence leave on October 24, 2012 and return the next day.").[9]

---

[9]  This is the only basis for the interference claim. The court makes this observation because the defendant argues several other dates at document 30, pages 18 through 23. Further,

Apparently in an attempt to demonstrate that she was "entitled to the [FMLA leave]" *Hurlbert*, 439 F.3d at 1293, the plaintiff devotes a substantial portion of her brief in support of <u>her</u> motion for summary judgment to: whether she is an eligible employee under the FMLA (doc. 28 at 11-12); whether the defendant is an eligible employer under the FMLA (doc. 28 at 12-13) whether she was entitled to FMLA leave (doc. 28 at 13-16); and whether the plaintiff provided sufficient notice of FMLA leave (doc. 28 at 16-18). The defendant admits that it is subject to the FMLA, that the plaintiff was covered under the FMLA, and that the plaintiff was entitled to leave under the FMLA. (Doc. 33 at 22). According, summary judgment will be granted to the plaintiff on the issue of whether she was entitled to FMLA leave on October 24,

---

the court notes that, in the complaint, the FMLA Interference claim includes allegations that:

– "[w]ithin one week of returning from her visit to the emergency room [on October 17, 2012], Haynes terminated [p]laintiff when she stated [she] would not quit because of her health and [the] need to continue health insurance."

– "[d]efendant terminated [p]laintiff's employment for the stated reason of [p]laintiff's health."

– "Haynes terminated [p]laintiff at approximately noon on October 24, 2012, an hour and a half before [p]laintiff's next doctor['s] appointment. Haynes and Gilbreath were well aware of the upcoming appointment with the doctor. Plaintiff's absence from work to go to the doctor's appointment was classified as an intermittent FMLA leave."

(Doc. 1 at 7). In none of her briefs does the plaintiff argue the first two grounds above. "[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).

2012.

Despite admitting the plaintiff's entitlement to leave, the defendant does not admit that it interfered with her right to take leave that day. It argues, correctly, that the plaintiff is not immune from termination simply because she was FMLA eligible. (Doc. 33 at 24). The taking of FMLA leave must be the "proximate," not "but for," cause of the employer's actions. *Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236, 1241 43 (11th Cir. 2010). "An employer can avoid liability if it can demonstrate that it refused to provide the benefit for a reason wholly unrelated to the FMLA leave." *Strickland v. Water Works and Sewer Bd.,* 239 F.3d 1199, 1208 (11th Cir.2001); *see also, Krutzig v. Pulte Home Corp.,* 602 F.3d 1231, 1236 (11th Cir.2010) ("[T]he right to commence FMLA leave is not absolute, and that an employee can be dismissed, preventing her from exercising her right to commence FMLA leave, without thereby violating the FMLA, if the employee would have been dismissed regardless of any request for FMLA leave."); *Leach v. State Farm Mut. Auto. Ins. Co.*, 431 F. App'x 771, 776 (11th Cir. 2011) ( "[I]f, the employee alleges that the employer denied the employee the right to reinstatement following FMLA leave, the employer has an opportunity to demonstrate it would have discharged the employee even had she not been on FMLA leave.") (internal quotations omitted); *Bradley v. Army Fleet Support, LLC*, No. 1:13CV308-WHA, 2014 WL 5307470, at *4 (M.D. Ala. Oct. 16, 2014)

(Albritton, J.) (same); *Hawkins v. BBVA Compass Bancshares, Inc.*, No. 2:12-CV-03922-RDP, 2014 WL 4715865, at *16 (N.D. Ala. Sept. 22, 2014) (Proctor, J.) (appeal pending) (same); *Howard v. U.S. Steel Corp.*, No. 2:11-CV-01010-KOB, 2014 WL 1042968, at *24 (N.D. Ala. Mar. 14, 2014) (Bowdre, J.) ("If an employer takes an adverse action that has the effect of preventing an employee from exercising an FMLA right, including <u>taking protected leave</u> or reinstatement, the employer will not be liable if it is able affirmatively to prove that it took the adverse action for a reason unrelated to FMLA leave.") (emphasis added).

The defendant argues that its reason for terminating the plaintiff before she took her FMLA leave that day was that she received her fourth disciplinary violation within 12 months. The following "Employee Disciplinary Reports" regarding the plaintiff appear in the record:

| Date | Disciplinary Action Taken | Reason for Action | Remarks |
|------|---------------------------|-------------------|---------|
| 1/26/12 | Verbal Warning | Unauthorized Absences | "Absent hours 88.57[.] Next unexcused absence will be a 1st written[.]" (Doc. 30-3 at 118). |
| 6/11/12 | First Written Warning | Unauthorized Absences | "Absence on 6-8-12 due 1st written[.]" (Doc. 30-3 at 119). |
| 6/26/12 | Second Written Warning | Poor Quality | "Poor quality & low productivity[.]" (Doc. 30-3 at 120). |

| 10/24/12 | Termination | Failure to follow work rules & policies. | "Her supervisor caught her on facebook @ 11:15 and . . . made her aware of the issue. 30 minutes later [her supervisor] caught her doing the same thing." (Doc. 30-3 at 129). |
| --- | --- | --- | --- |

The defendant argues that, because none of these incidents of discipline were related to the plaintiff's FMLA leave, it did not "interfere" with her leave when it terminated her. (Doc. 33 at 24). The plaintiff makes several arguments why the real reason she was terminated was actually because she requested and took FMLA leave.

This termination is also the basis for the plaintiff's FMLA retaliation claim. As one judge in this district has recently observed, under these circumstances "[the] [p]laintiff's FMLA claims essentially merge into one [retaliation] claim." *Hawkins v. BBVA Compass Bancshares, Inc.*, No. 2:12-CV-03922-RDP, 2014 WL 4715865, at *16 (N.D. Ala. Sept. 22, 2014) (Proctor, J.). The undersigned agrees. The pretext analysis done in relation to the retaliation claim will effectively determine whether the plaintiff was fired "for a reason wholly unrelated to the FMLA leave." *Strickland*, 239 F.3d at 1208.[10]

For the reasons stated in the next section, the court determines that there is a

---

[10]All of the parties' arguments concerning whether the termination was for a reason "wholly unrelated to the FMLA leave" will be treated by the court as "pretext" arguments in its analysis of the retaliation claim.

genuine issue of material fact as to whether the defendant's stated reasons for the termination are legitimate non leave based reasons. The court also determines that there is a genuine issue of material fact whether defendant's reasons are pretextual and defendant in fact terminated the plaintiff for requesting family medical leave. Accordingly, summary judgment will be denied as to both parties' cross motions on this claim.

### 2.    *The FMLA Retaliation Claim*

The defendant moves for summary judgment on this claim. As noted, the plaintiff claims that her termination was in retaliation for using FMLA leave. The plaintiff's case is based solely on circumstantial evidence. The Eleventh Circuit has stated:

> When a plaintiff asserts a claim of retaliation under the FMLA, in the absence of direct evidence of the employer's intent, we apply the same burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), for evaluating Title VII discrimination claims. *See Brungart v. BellSouth Telecomm. Inc.,* 231 F.3d 791, 798 (11th Cir.2000). In order to state a claim of retaliation, an employee must allege that: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment decision; and (3) the decision was causally related to the protected activity. *Parris v. Miami Herald Publ'g Co.,* 216 F.3d 1298, 1301 (11th Cir.2000).

*Strickland*, 239 F.3d at 1207; *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 798 (11th Cir. 2000) (same).

> Once a plaintiff has established a prima facie case, the employer then has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action. *Olmsted* [*v. Taco Bell Corp.,*] 141 F.3d [1457,] 1460 [(11th Cir.1998)]; *Meeks* [*v. Computer Associates Int'l*], 15 F.3d [1013,] 1021 [(11th Cir. 1994)]. The ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct remains on the plaintiff. *Olmsted*, 141 F.3d at 1460.

*Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).

## a.     The Plaintiff's Prima Facie Case

The defendant contends only that the plaintiff cannot make out a prima facie case of retaliation "because she cannot establish the casual connection element of her case – that Kappler terminated her for engaging in protected activity." (Doc. 30 at 24).[11]

In *Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236, 1243 (11th Cir. 2010), the Eleventh Circuit noted that close temporal proximity between FMLA leave and termination "is more than sufficient to create a genuine issue of material fact of causal connection" for purposes of an FMLA retaliation claim. The broadest reading of the facts reflects that the plaintiff was to take FMLA leave on the very day she was fired. There is a genuine issue of material fact as to causation.[12]

---

[11] Kappler affirmatively states that it "does not contest the first or second elements of [p]laintiff's claim." (Doc. 30 at 24).

[12] On July 6, 2012, the plaintiff submitted a second FMLA certification request, signed by Dr. McCoomer. The plaintiff's attendance sheet shows she was coded for FMLA absences on

### b.     The Legitimate Non-Discriminatory Reason

There being at least a genuine issue of material fact as to whether the plaintiff can make out a prima facie case, Kappler must articulate a legitimate, non-retaliatory reason for the challenged employment action. *Olmsted*, 141 F.3d at 1460. First, however, the plaintiff argues that the defendant has waived its right to articulate these reasons.

### (1)     The Defendant Has Not Waived Its Right to Articulate a Legitimate Non-Retaliatory Reason

The plaintiff first argues that the alleged legitimate non-retaliatory reasons for her termination are affirmative defenses that the defendant was required to plead in its answer, but did not. (Doc. 28 at 21). "[A] defendant intending to assert an affirmative defense must raise it in a responsive pleading, and failure to do so typically results in a waiver of the defense." *Edwards v. Fulton Cnty., Ga.*, 509 F. App'x 882, 887 (11th Cir. 2013) (*citing Am. Nat'l Bank of Jacksonville v. FDIC*, 710 F.2d 1528, 1537 (11th Cir.1983)).

Assuming that the defendant's stated reason for the plaintiff's termination is required to be raised in the defendant's Answer, the defendant did so. Paragraph 34

---

August 3, 2012, and October 17, 2012. (Doc. 30-1 at 89). Haynes stated either she or the plaintiff's supervisor would have coded the attendance sheet for October 17, 2012, seven days prior to the final warning received by the plaintiff on October 24, 2012. Both Haynes and the plaintiff's supervisor were involved in this final warning, which resulted in her termination. (Doc. 30-3 at 129).

of the Complaint states: "[d]efendant willfully and intentionally violated the FMLA by interfering with [p]laintiff's rights under that act." (Doc. 1 at 6). In its Answer, in response to paragraph 34, Kappler states: "[d]efendant denies each and every allegation contained within [p]aragraph 34 of [p]laintiff's Complaint." (Doc. 8 at 7). Paragraph 35 of the Complaint states: "[d]efendant terminated [p]laintiff's employment for the stated reason of [p]laintiff's health." (Doc. 1 at 6). In response, Kappler answered: "[d]efendant denies each and every allegation contained within [p]aragraph 35 of [p]laintiff's Complaint." (Doc. 8 at 7). Further, Kappler's tenth affirmative defense in its Answer stated that: "Even if intentional discrimination and retaliation were motivating factors in an employment decision regarding [p]laintiff, which [d]efendant denies, [d]efendant would have taken the same action in the absence of any impermissible factor." (Doc. 8 at 12). Kappler's twelfth affirmative defense stated that: "There is no causal link, factual or proximate, between [d]efendant's alleged acts or omissions and [p]laintiff's alleged injuries or damages." (Doc. 8 at 13). Both of these affirmative defenses, along with the denials, support Kappler's position that its reasons for terminating the plaintiff were lawful and wholly unrelated to her FMLA leave. There is no need to state specifically in the Answer that the plaintiff was fired for having received her fourth disciplinary action within the last twelve months.

Further, even if these defenses were not properly raised under Rule 8(c) of the Federal Rules of Civil Procedure, "a defendant does not waive an affirmative defense if the earlier omission from responsive pleadings does not prejudice the plaintiff." *Edwards v. Fulton Cnty., Ga.*, 509 F. App'x 882, 887 (11th Cir. 2013) (*citing Proctor v. Fluor Enters., Inc.*, 494 F.3d 1337, 1350 (11th Cir.2007)).  The plaintiff has shown no prejudice.[13]

### (2)    The Stated Reasons

In the section of its initial motion for summary judgment brief entitled "Defendant Has Offered A Legitimate Non-Retaliatory Reason For Plaintiff's Termination" the defendant states: "Kappler terminated [p]laintiff because she received four work-rule disciplinary violations within a twelve month rolling period." (Doc. 30 at 27).  Similarly, in other areas of the defendant's submissions, it

--------

[13] In a footnote to her reply brief to her motion for summary judgment, the plaintiff argues that *Edwards*, and another case cited by the defendant, is distinguishable because, in those cases:

> the employer first raised its affirmative defense in *the employer's* Rule 56 motion; whereas here, an employer seeks to raise an unplead affirmative defense to defeat an employee's Rule 56 motion. This distinction is key; in response to an employer's Rule 56 motion, a court that allowed an employee to assert additional claims after the close of discovery would very likely be reversed for abuse of discretion. Fundamental fairness should prevail.

(Doc. 37 at 11, n. 6). This confusing argument is without merit. At the end of the day, no matter when it was raised, the alleged affirmative defense should be allowed in the absence of a showing of prejudice to the plaintiff.

44

consistently states:

> – "Plaintiff's termination fully complied with Kappler's progressive disciplinary policy, which provided that employees are terminated after they commit a fourth disciplinary violation within a rolling twelve month period. Here, [p]laintiff received three disciplinary warnings (two for absenteeism and one for poor production), and then committed a fourth violation, use of her cell phone on the plant floor, during a nine month period prior to her termination on October 24, 2012." (Doc. 30 at 4-5).

> –"Plaintiff was validly terminated for accumulating more than three work rule violations when she violated company policy on October 24, 2012 by using a cell phone." (Doc. 30 at 27).

> – "Plaintiff was terminated for legitimate reasons which were wholly unrelated to her right to FMLA leave. Plaintiff was terminated on October 24, 2012 when she used her cell phone on the plant floor in direct violation of company policy and her supervisor's orders – her fourth disciplinary violation in twelve months." (Doc. 33 at 24).

> – "Plaintiff's termination fully complied with Kappler's progressive disciplinary policy. Plaintiff received three disciplinary warnings (two for absenteeism and one for poor production), and then committed a fourth violation, use of her cell phone on the plant floor, during a nine month period prior to her termination on October 24, 2012." (Doc. 39 at 4-5).

> – "Kappler articulated its legitimate and nondiscriminatory reason for Plaintiff's termination (four disciplinary warnings within a twelve month period) in its principal [b]rief." (Doc. 39 at 14).

Confusingly however, in its initial brief in support of its motion for summary judgment, just a few lines after first stating that "Kappler terminated [p]laintiff because she received four work-rule disciplinary violations within a twelve month rolling period" (doc. 30 at 27), the defendant writes:

45

> [A]s discussed above, Kappler's legitimate non-retaliatory reason for
> [p]laintiff's termination is <u>that she violated company policy by using her
> cell phone at her work station during working hours</u>. . . . <u>Additionally,
> [p]laintiff was insubordinate</u> when she failed to put away her cell phone
> after being instructed by Ms. Gilreath to do so. (Moon Depo. p. 18, l. 5-
> 17, Exh. 2 Kappler Employee Handbook, see p. 21, 22) ("Certain
> conduct, or disregard for the rules, are severe enough to result in
> disciplinary action or termination . . . g. Insubordination . . . .").
> <u>Additionally, [p]laintiff received three other disciplinary warnings prior
> to her termination</u> . . . placing her well along Kappler's progressive
> disciplinary policy leading to termination.

(Doc. 30 at 27-28) (emphasis added). The plaintiff argues these statements, and other

similar statements by the defendant, amount to "confusing" and "inconsistent" reasons

for the plaintiff's termination. (Doc. 35 at 34; doc. 37 at 4). The defendant makes no

attempt to address the apparent discrepancy.

The court finds that the statements at document 30, pages 27-28, can only be

construed as <u>three separate reasons</u> for the termination, instead of somehow being a

further explanation for how the plaintiff was fired under the progressive discipline

policy. The use of the term "additionally" twice, and the citation of the policy

allowing for termination for "insubordination," a policy separate and apart from the

progressive discipline policy, make that conclusion clear. Therefore, the court finds

that the defendant has alleged a total of three separate reasons for the plaintiff's

termination: 1) that the plaintiff violated the cell phone policy one time; 2) that she

was insubordinate on October 24, 2012; and 3) that she had 4 total violations in a 12

month period.

### c.     Pretext

The defendant having articulated legitimate non-discriminatory reasons for the termination, the burden thus shifts again to the plaintiff to prove that the reasons provided by Kappler are a pretext for prohibited, retaliatory conduct. *Olmsted*, 141 F.3d at 1460.[14] The plaintiff must "meet [each proffered] reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (internal quotations and citations omitted).

To establish pretext, the plaintiff has to demonstrate

that the proffered reason was not the true reason for the employment decision ... [The plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. . . . [The plaintiff ] could do this by pointing to weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the proffered explanation.

*Brooks*, 446 F.3d at 1162-63. Importantly, "[a] reason is not pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real

---

[14] The plaintiff argues that the defendant "failed to articulate its legitimate non-discriminatory reason in the light most favorable to the [p]laintiff." (Doc. 35 at 27-28). It is true that "[o]n a summary judgment motion, the record and all reasonable inferences that can be drawn from it must be viewed in the light most favorable to the non-moving party." *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1223 (11th Cir. 2004). But the court knows of no requirement that the defendant state its legitimate non-discriminatory reason in such a light.

reason." *Id.* at 1163.

### (1)   *Violation of the Cell Phone Policy Alone*

The plaintiff points to Haynes's testimony in her deposition where she admitted that employees "don't get fired for violation of the cell phone policy by itself." (Doc. 30-1 at 39(145)). The plaintiff has rebutted "violation of the cell policy alone" as being the reason for her termination.

### (2)   *Insubordination*

There is <u>no</u> evidence that the defendant fired the plaintiff under the insubordination policy. The Personnel Action Form dated October 24, 2012, states that the plaintiff was involuntarily terminated on that date for: "Failure to follow work rules & policies. Her supervisor caught her on facebook @ 11:15 and . . . made her aware of the issue. 30 minutes later [her supervisor] caught her doing the same thing." (Doc. 30-3 at 129). It does not state that the plaintiff was "insubordinate" nor does it quote the handbook policy discussing sanctions for insubordination.   In her deposition, Haynes does not discuss "insubordination" as a reason for the plaintiffs termination. Instead she was clear that the plaintiff was terminated because she had four disciplines in a 12 month period. (Doc. 30-1 at 42(157-160)). The plaintiff testified in her deposition that Haynes and Gilreath told her that she was fired <u>only</u> because she had been texting. (Doc. 30-3 at 24(90)). The "failure to raise an issue

[with an employee] could . . . indicate that it was not serious enough to warrant discussion." *Hinson v. Clinch Cnty., Georgia Bd. of Educ.*, 231 F.3d 821, 831 (11th Cir. 2000).

Indeed, as far as the court can tell from the record, the defendant's brief in support of its motion for summary judgment is the first instance in which this reason has ever been cited. *See, e.g., Hinson*, 231 F.3d at 831 (noting that an employer's raising complaint for the first time in response to an EEOC Charge is suspect); *see also, Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298-99 (11th Cir. 2006) ("We have recognized that an employer's failure to articulate clearly and consistently the reason for an employee's discharge may serve as evidence of pretext. . . . Here, the corrective counseling statement and separation notice documenting Hurlbert's termination make no reference to his disciplinary status or job performance, and identify the sole reason for his termination as an 'inability to pass the competency review' or '[f]ailure to meet competency requirements.' Furthermore, Jeff English testified that he advised Butler to follow through with termination because of Hurlbert's 'borderline insubordinate behavior' in walking out of the September 6th meeting with her, yet no charge of insubordination appears in the foregoing termination documents.").

As if this were not enough to find pretext, there is evidence that similarly

49

situated employees Pam Gibbs (doc. 35 at 29, 39) and Avery Thackerson (doc. 35 at 29), were treated differently than the plaintiff. Thackerson received a warning for "[c]ontinued use of personal cell phone on blowing floor during work hours." (Doc. 30-1 at 103). Haynes agreed in her deposition that the use of the phrase "continued use," meant that Thackerson was not disciplined the first time that he was seen using his phone. (Doc. 30-1 at 38(144)-39(145)). Haynes also indicated in her deposition that Thackson was given an "oral" warning regarding the policy previously. (Doc. 30-1 at 39 (145)). Gibbs received a warning which stated that she "continues to use her cell phone on the sewing floor after repeated warnings from her supervisor." (Doc. 30-1 at 102). In her deposition, Haynes agreed that, based on the use of the phrase "continues to use," Gibbs would not have received any discipline the first time she was seen using her cell phone. (Doc. 30-1 at 38(142-143)). These incidents appear to the court to be substantially similar in all relevant respects to the discipline the plaintiff received for violation of the cell phone policy. Gibbs and Thackerson, however, were not fired for insubordination. The plaintiff has rebutted this proffered reason for her termination.

**(3)** *Receiving Four Disciplines In Twelve Months*

> **(a)     There Is No Evidence that the January 26, 2012, Warning Was Improper.**

The plaintiff first argues that the cell phone use violation should not have been

the plaintiff's <u>fourth</u> violation because the January 26, 2012, verbal warning, for unauthorized absences, was not merited. (Doc. 37 at 4).[15] In particular, she contends that the January 26, 2011, and December 14, 2011, absences (which were absences included within the total number of absences noted in the January 26, 2012, warning) should have been counted as FMLA leave. (Doc. 37 at 4-8).[16]

It is unclear to the court what difference recharacterizing either of these absences would make. According to the first warning issued by the defendant, the plaintiff had a total of 88.57 hours of unexcused absences. (Doc. 30-3 at 129). As noted above, the defendant's attendance policy calls for the following progressive discipline:

> **<u>Verbal Warning</u>** - greater than or equal to 44 hours
> **<u>First Written Warning</u>** – greater than or equal to 64 hours
> **<u>Second Written Warning</u>** – greater than or equal to 84 hours
> **<u>Termination</u>** – greater than or equal to 100 hours

> ·    Any misrepresentation by the employee concerning the reason for the absence will be grounds for immediate termination.

(Doc. 30-3 at 86) (bold typeface in original). The two absences at issue account for

---

[15] As noted, the employee handbook also allows for bypassing the progressive discipline policy and the attendance policy altogether, for certain conduct including: "[c]ontinual lateness or unauthorized absences." (Doc. 30-3 at 97-98). However, that is not the reason stated by the defendant for terminating the plaintiff.

[16] Confusingly, over 84 such hours should have received a "Second Written Warning" (doc. 30-3 at 86) under the <u>attendance policy</u>. Instead, the plaintiff received a verbal warning under the <u>discipline policy</u>. The relationship between the two policies, and why it was handled this way has not been made clear by the parties.

a total of 9.58 hours--3.6 hours on January 26, 2011, and 5.98 hours on December 14, 2011. (Doc. 30-1 at 85, 87). Assuming that the two absences were not counted against the plaintiff, she would still have 78.77 hours of unexcused absences remaining. That would <u>still</u> be a violation of the attendance policy.[17] Haynes testified that, even if these absences had not been counted against the plaintiff "[she] still would have issued the verbal warning of January 26, 2012." (Doc. 34-8 at 4).[18] Indeed, the plaintiff agreed in her deposition that if the hours exceeded 44, after mis-coded absences were removed from the calculation, she would not dispute the warning. (Doc. 34-3 at 18(68)). Accordingly, there is no genuine dispute that <u>some</u> warning should have been issued on January 26, 2012.

Based on the foregoing, there is no need to consider the other arguments in made by the parties, including:

– whether the absences on the dates in question should have been considered as FMLA leave (doc. 30 at 18-23; doc. 37 at 5);

– the alleged "absence of a 'Kappler Employer Absentee Detail'" from the January 26, 2012, report prevented the plaintiff from disputing the

---

[17] Under the <u>attendance policy</u>, that amount would still qualify for at least a "First Written Warning." (Doc. 30-3 at 86 ("greater than or equal to 64 hours")).

[18] In her opposition to the defendant's motion for summary judgment, the plaintiff also discusses absences on February 3, 10, and 24, 2011. (Doc. 35 at 17-18). It is undisputed that these absences were not coded in such a way as to count against the plaintiff for disciplinary purposes.

characterization of these absences as "unexcused." (Doc. 35 at 18; doc. 37 at 5).

– the plaintiff's argument that these two dates should have been retroactively coded as FMLA leave. (Doc. 35 at 18; doc. 37 at 6-8; doc. 39 at 7-10).[19]

### (b)   The Plaintiff Has Rebutted this Proffered Reason

Close temporal proximity between a request for leave and termination is evidence of pretext. *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006). In this case, under the broadest reading of the facts, the plaintiff was to take FMLA leave <u>the day she was terminated</u>. That is about as temporally close as it gets. Of course, the *Hurlbert* court was clear that while close temporal proximity is evidence of pretext, it is "probably insufficient to establish pretext by itself." *Hurlbert*, 439 F.3d at 1298. In this case, substantially more evidence of pretext exists.

In particular the plaintiff cites several comparators who were treated more

---

[19] In its motion for summary judgment, the defendant discusses "several of [the plaintiff's] unexcused absences" that the defendant states the plaintiff objected to in her deposition, and which the plaintiff claims should have been coded as FMLA leave. (Doc. 30 at 19-20). In the plaintiff's response to the defendant's motion for summary judgment, she discusses three dates in particular: March 8, April 20, and June 1, 2012, which she contends were covered by her <u>second</u> FMLA certification and which should also have been "excused." (Doc. 35 at 19-20). As with the previous dates discussed, the point of this argument is not clear.  None of the four disciplinary actions against the plaintiff relate to these absences. Other than the warning issued on January 26, 2012, the plaintiff received only one other warning for absenteeism on June 11, 2012, for her "[a]bsence on 6-8-12." (Doc. 34-8 at 7).

favorably than she. It has been noted:

> A typical means of establishing pretext is through comparator evidence. *Silvera v. Orange County Sch. Bd.,* 244 F.3d 1253, 1259 (11th Cir.2001); *Sparks v. Pilot Freight Carriers, Inc.,* 830 F.2d 1554, 1563 n. 20 (11th Cir.1987). A comparator is "a similarly-situated employee who committed the same violation of work rules, but who was disciplined less severely than [the plaintiff]." *Rioux,* 520 F.3d at 1276.

*Walker v. St. Joseph's/Candler Health Sys., Inc.*, 506 F. App'x 886, 889 (11th Cir. 2013); *see also*, *Jackson v. Agency for Persons with Disabilities Florida*, No. 14-12650, 2015 WL 1637587, at *2 (11th Cir. Apr. 14, 2015) (unpublished) ("Where an employer's proffered reason for termination is the violation of a workplace rule, we have held that explanation to be arguably pretextual when a plaintiff can submit evidence that: (1) she did not violate the cited work rule; or (2) if she did violate the rule, other employees outside the protected class, who engaged in similar acts, were not similarly treated.") (internal quotations and citations omitted). "'In determining whether employees are similarly situated for purposes of establishing a *prima facie* case, it is necessary to consider whether the employees are involved in or accused of the same *or similar conduct* and are disciplined in different ways.'"*King v. Piggly Wiggly Alabama Distribution Co.*, 929 F. Supp. 2d 1215, 1222 (N.D. Ala. 2013) (Hopkins, J.) " (quoting *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.1997) (emphasis in original). While there has been some dispute as to what the phrase

"similarly situated" means in this context,[20] it is clear that the burden is on <u>the plaintiff</u> to show that the employees were 'similarly situated in all relevant respects.'" *Jackson*, 2015 WL 1637587 at *2 (*quoting Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir.2003)).

The plaintiff cites to the following comparators: Josh Clark (doc. 35 at 35-36);

---

[20]Judge Myron Thompson in the Middle District of Alabama recently, recently noted:

> The meaning of the phrase 'similarly situated' in Title VII has been the subject of conflicting interpretations in the Eleventh Circuit. One line of cases holds that the comparator's conduct must merely be similar. *See, e.g., Alexander v. Fulton Cnty., Ga.,* 207 F.3d 1303, 1333–34 (11th Cir.2000) (rejecting nearly identical standard in favor of similar-conduct standard), overruled on other grounds, *Manders v. Lee,* 338 F.3d 1304 (11th Cir.2003); *King v. Piggly Wiggly Alabama Distribution Co.,* 929 F.Supp.2d 1215, 1223 (N.D.Ala.2013) (Hopkins, J.) (requiring only similar conduct and rejecting the nearly identical standard as inconsistent with the intent of Title VII).

> Another line of cases holds that, for a comparator to be considered similarly situated, "the quantity and quality of the comparator's misconduct [must] be *nearly identical* to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."*Burke–Fowler,* 447 F.3d at 1323 (emphasis added). In *Burke–Fowler,* the court acknowledged that the *Alexander* court had required only similar conduct but reasoned that, under the 'prior panel' rule, it was bound to follow the 1999 ruling in *Maniccia,* 171 F.3d at 1368, which adopted the nearly identical standard in discipline-related cases. *See Burke–Fowler,* 447 F.3d at 1323, n. 2.

*Parten v. Alabama Dep't of Tourism,* No. 2:13CV944 MHT, 2015 WL 1781588, at *6, n. 6 (M.D. Ala. Apr. 20, 2015) (Thompson, J.); *see also, Jackson v. Agency for Persons with Disabilities Florida*, No. 14-12650, 2015 WL 1637587, at *2 (11th Cir. Apr. 14, 2015) (unpublished) (citing *Burke–Fowler v. Orange Cnty.,* 447 F.3d 1319, 1323 & n. 2 (11th Cir.2006)) ("In instances where the plaintiff is disciplined for misconduct, it is the plaintiff's burden to show other employees were engaged in 'nearly identical' conduct and yet were treated more favorably."); *Walker v. St. Joseph's/Candler Health Sys., Inc.*, 506 F. App'x 886, 889 (11th Cir. 2013) ("[T]he quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.")

Darlene Stanford (doc. 35 at 36-37); Breanna Cochran (doc. 35 at 37-38); Pam Gibbs (doc. 35 at 29, 39); and Avery Thackerson (doc. 35 at 29).[21] Noting the plaintiff's burden, the defendant cursorily states that she has failed to carry it. (Doc. 39 at 11). This underdeveloped argument is without merit. The plaintiff was disciplined 4 times for violation of work rules. Each of the above cited individuals similarly violated a work rule at some point. The difference is, with the plaintiff's comparators discretion was exercised and no discipline was given.

For example, with Josh Clark the plaintiff argues that "[a] jury can infer Clark received a 'free pass' on discipline. He was not fired for four incidents within twelve months.[22] Haynes waited until . . . a fifth incident of insubordination before terminating Clark's employment." (Doc. 35 at 36). As discussed in the "facts" above, the plaintiff's math is based on counting the April 15, 2014, incident where Clark at first refused a request to "turn" a suit, and then said "I will turn the damn suit." (Doc. 36-1 at 3). Haynes agreed that Clark could have been formally disciplined for this

---

[21] She also cited Katie Golden (doc. 35 at 38-39) and Vickie Rozanski (doc. 35 at 39-40) whom the court will not discuss. To the extent that they are pertinent, the defendant's arguments directed towards these comparators will be included. However, the court generally notes that the defendant's response is hardly comprehensive. (Doc. 39 at 12-13).

[22] The defendant argues that since the plaintiff was supervised by Chris Gilreath and Clark was not, Clark is not a valid comparator. (Doc. 39 at 12). It is true that "differences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination." *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1261 n. 5 (11th Cir. 2001). However, Haynes was everyone's ultimate supervisor.

incident, but was not. (Doc. 30-1 at 61).[23] If Clark had been disciplined on April 15, 2014, he would have reached four disciplines sooner, and, therefore, been fired sooner. Similarly, Haynes admitted that discretion was exercised when Breanna Cochran was given only one discipline on October 29, 2012, for two offenses. (Doc. 30-1 at 54(205); doc. 35 at 37).[24] On September 15, 2011, Stanford received a Second Written Warning and a suspension for: "Abuse or Destruction of Company Property," "Insubordination," and "Poor Quality" which Haynes admitted could have been multiple offenses, but discretion was exercised to issue just one. (Doc. 30-1 at 57(217); doc. 30-1 at 124).[25] Further, in her deposition, Haynes admitted that she could have terminated Stanford for initially failing to return to work on the right day. (Doc. 30-1 at 57(217-218)). Instead, Stanford just received another suspension (not a discipline). She was only fired when she committed yet another violation of a different work rule.

---

[23] The defendant states, without explaining, that "a review of the Clark documents makes clear why Ms. Bishop did not consider this issue worthy of a disciplinary warning." (Doc. 39 at 12). The court will not supply an explanation that the defendant failed to articulate.

[24] The defendant fails to respond to this argument at all, stating only that Cochran "was terminated upon receipt of four warnings," and then discussing Cochran's attendance records. (Doc. 39 at 13).

[25] The defendant insists that this was actually harsher treatment that the plaintiff received because Stanford was suspended and then terminated a week after she returned. (Doc. 39 at 13). The defendant misses the point. If these offenses had been separated into three separate "disciplines," Stanford would have been fired sooner.

Finally, and most telling, are Pam Gibbs (doc. 35 at 29, 39) and Avery Thackerson (doc. 35 at 29). The plaintiff argues:

> Both Gibbs and Thackerson received previous warnings before the write-up. In light of other employees' continued violation of the cell phone policy, a jury can also infer that Haynes does not put much emphasis on the cell phone policy, unless of course the employee is disabled, and/or otherwise exercised rights under the FMLA.

(Doc. 35 at 29). She also alleges that she "received no such previous warning under the alleged 'cell phone' policy." (Doc. 37 at 10, n. 5). The plaintiff admits that she was texting (not using Facebook) that day, during work hours, at her work station, and during work time. (Doc. 30-3 at 22(82)-23(85)). The plaintiff admits that her supervisor approached her and told her "to stop texting," but says that only after that incident did she know that texting was not allowed. (Doc. 30-2 at 23(87)). Specifically, she stated: "On the day that Chris come [sic] up to me and told me to quit texting was the day that I knew that it wasn't allowed." (Doc. 30-3 at 23(22)). The plaintiff states that after that first instance she did not text again. (Doc. 30-3 at 23(88)-24(89)).[26,27] Based on this version of events, a jury could determine that the plaintiff

---

[26] The defendant notes this argument saying:

In support of her pretext argument, [p]laintiff focuses on her fourth disciplinary action (for cell phone usage) and argues that several other Kappler employees received previous warnings or second chances when they were caught violating the company cell phone policy but were not terminated for this violation. . . . Plaintiff's argument is disingenuous on several levels: first, her testimony (that Kappler policy allowed her use her cell phone), is contrary to Kappler disciplining employees for cell phone use before Plaintiff's termination. Second,

was disciplined the <u>first</u> time she was caught using her phone. In other words, that, unlike Thackson and Gibbs, she did not receive the benefit of a warning before being disciplined.[28]

---

> her cell phone records show extensive cell phone use both calling and texting by Plaintiff during work time during the several weeks preceding her termination.

(Doc. 39 at 16). These sentences seem to actually acknowledge that the comparators were warned, but fail to explain why <u>she</u> was not, opting instead for misdirection. Whether she thought she could use her cell phone or not, and whether she was lying as to what she thought or not, has nothing to do with whether Kappler unevenly applies the cell phone policy. Similarly, how much she used her phone has nothing to do with whether others received warnings <u>when they were caught</u>, and she did not.

[27] The defendant insists that the plaintiff was only disciplined after the second time the plaintiff violated the policy. *See e.g.*, doc. 30 at 28 " [p]laintiff was insubordinate when she failed to put away her cell phone after being instructed . . . to do so;" doc. 33 at 25 "she was not terminated until a second incident." As noted, the evidence, when viewed in the light most favorable to the plaintiff, reflects that she was <u>caught</u> texting only once.   The defendant argues that the plaintiff's cell phone records show "that [p]laintiff used her StraightTalk cell phone for text messages or phone calls a total of 272 times during confirmed working hours on the dates of October 1, 2, 3, 4, 8, 10, 11, 15, 16, 18, 22, 23, and 24.  Plaintiff averaged 20.9 outgoing phone calls or outgoing texts each work day in October 2012."  (Doc. 39 at 16).  These incidents, except for maybe those on October 24, 2012, are irrelevant and will not be considered.  The plaintiff was not disciplined for "excessive use of her cell phone in the month of October 2012."

[28] The facts reflect three other incidents which also evidence pretext when considered along with the evidence already described. First, Haynes told Gilreath to "watch" the plaintiff for future misconduct. (Doc. 35 at 10, 31, 43). As the plaintiff notes: "A jury can certainly infer that Haynes had a target on Plaintiff's back that was set to find a pretextual reason for termination and that she ordered Gilreath to find that reason." (Doc. 35 at 29).  Second, when she was brought into Haynes's office Haynes specifically asked the plaintiff "if she needed to quit work on [her] health." (Doc. 30-3 at 24(89)). And finally, that on October 25, 2012, the day after the plaintiff was terminated, Haynes issued a notice to employees which stated:

> Cell phones or any electronic device that can be used to call, text[,] or access the internet should **not** be used on the sewing floor during working hours. These devices should be kept out of sight[;] **do not have them on any work area.**

> Any violation of this policy will result in disciplinary action.

Finally, it has never been explained how all of the defendant's discipline policies are expected to work together, if at all. A jury could infer that the combination of all of the defendant's policies, and the haphazard way in which they have been applied, especially the absentee policy, is a pretext for discrimination.[29]

The court determines that there is a genuine issue of material fact as to whether the defendant's stated reasons for the plaintiff's termination were actually a pretext for terminating her for requesting and taking FMLA leave.[30]

**B.     ADA Claim (Count Three)**

The defendant moves for summary judgment on the ADA claim.

In Count Three, the plaintfif alleges _only_ that her termination was because of her disability, in violation of the ADA. (Doc. 1 at 9).[31] The Eleventh Circuit has

---

(Doc. 30-1 at 108) (emphasis in original). While "use" of cellphones in the work are had been prohibited previously, this was the first explicit statement prohibiting texting during work hours. There is a dispute as to whether "use" meant "texting" or "calling."

[29] The plaintiff also insists that she has presented "'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" (Doc. 35 at 42) (quoting _Smith v. Lockheed-Martin Corp._, 644 F.3d 1321, 1328 (11th Cir. 2011)). The defendant does not respond to this argument. Regardless, that analysis is another way for a plaintiff to establish a prima facie case where production of a comparator is an element thereof. In the instant case, the plaintiff has produced comparators as evidence of pretext.

[30] Further, as previously noted, the evidence does not eliminate any genuine issue of material fact as to whether or not it the termination was "related" to the FMLA leave so as to entitle the plaintiff to summary judgment on the FMLA interference claim. Accordingly, the plaintiff's motion is also due to be denied.

[31] The defendant anticipates two such grounds, or arguments that the plaintiff does not make. The first such argument is that "[the plaintiff's] alleged disability caused her excessive absences and tardiness." (Doc. 30 at 31). The second such argument is that the defendant failed

recently stated:

> The Americans with Disabilities Act forbids a "covered entity" from discharging "a qualified individual on the basis of disability." 42 U.S.C. § 12112(a).   In order to state a prima facie discriminatory termination claim under the ADA, a plaintiff must show three things: (1) he is disabled; (2) he is a qualified individual; and (3) he suffered unlawful discrimination because of his disability. *Pritchard v. Southern Co. Serv.*, 92 F.3d 1130, 1132 (11th Cir.1996).

*Jarvela v. Crete Carrier Corp.*, 776 F.3d 822, 828 (11th Cir. 2015).  The defendant argues (although in an underdeveloped fashion) that the plaintiff cannot prove that her termination was "because of" her disability. Referring back to earlier portions of its brief, the defendant repeats its confusing argument as to the actual reason for the plaintiff's termination – which the undersigned has already analyzed as three alternative reasons for the plaintiff's termination. Specifically, defendant writes:

> As established in Sections III B and III C above, Plaintiff was terminated because she had accumulated four work-rule violations within a rolling twelve month period. By October 24, 2012, Plaintiff had received two disciplinary warnings for excessive absences and tardiness, one warning for poor quality and low productivity, and was finally terminated on October 24th for a violation of Kappler's cell phone policy. Further, Plaintiff was given a verbal warning to put her cell phone away, before she was caught with her cell phone out again, and terminated. (cite). [Sic].

(Doc. 30 at 30).

---

to reasonably accommodate plaintiff. (Doc. 30 at 32). Because these are not the basis for the plaintiff's claim and she has not made these arguments, the court need not and will not address defendant's anticipatory arguments.

The court notes that the same *McDonnell Douglas* burden shifting framework that the court earlier in this opinion applied to plaintiff's FMLA retaliation claim also applies to her ADA retaliation claim. *Wofsy v. Palmshores Ret. Cmty.*, 285 F. App'x 631, 634 (11th Cir. 2008). And, for the same reasons discussed above in the section of this opinion relating to the plaintiff's FMLA retaliation claim, the court finds that genuine issues of material fact exist as to whether the defendant retaliated against the plaintiff in violation of the ADA.

## IV.   CONCLUSION

For the reasons set out above (regarding the arguments as to which issue was actually joined by the parties' briefs), the court finds that genuine issues of material fact exist such that both motions for summary judgment are due to be, and hereby are, **DENIED**.

**DONE** and **ORDERED** this 19th day of May, 2015.

**VIRGINIA EMERSON HOPKINS**
United States District Judge